UNIVERSITY OF MARYLAND MEDICAL CENTER
22 South Greene Street
Baltimore, Maryland 21201-1595
410.328.5720

DIVISION OF NEPHROLOGY



# UNIVERSITY OF MARYLAND
# SCHOOL OF MEDICINE

December 4, 2006

Pursuant to a request from Justin M. Cuniff who represents the dialysis provider, DaVita, I have been requested to conduct a review of the circumstances surrounding the death of Michael Farrar including the medical treatment the patient received while incarcerated at the Central Detention Facility of the District of Columbia Department of Correction. The fee for my review of the medical records is at the rate of $400.00 per hour.

Medical Records from the DC Department of Corrections, Gambro Dialysis Center, Greater Southeast Hospital, and an Autopsy Report from the Office of the DC Medical Examiner have been reviewed. I have also reviewed a statement from correctional officers who found the patient without vital signs on December 29, 2003.

From that review of the above referenced documents, I have been requested to evaluate and determine the existence, if any, of a relationship between the death of the patient on December 29, 2003 and the adequacy of the dialysis care that was being administered to the patient during the time-frame of September to December, 2003. I have been further requested to determine if any deviations from the standard of care occurred and whether such deviations were proximately related to the death of the patient.

The patient, Michael Farrar, was a 45 year-old African American male who entered the correctional system in September 2003. Upon admission to the Central Treatment Facility of the DC Department of Corrections, it was noted that the patient suffered from renal disease, congestive heart failure, gout, and hypertension, among other diseases. He was on a variety of medications for these illnesses. He had been receiving dialysis treatments since October 2001.

A discharge summary, dated September 22, 2003, indicates that the patient was discharged form Greater Southeast Community Hospital after suffering shortness of breath. The record reflected that the patient had missed his dialysis treatment that had been scheduled. The admitting diagnosis was congestive heart failure and end stage renal disease.

The dialysis records also indicate that on September 24, 2003 the patient underwent placement of a cuffed "tunneled" dialysis catheter placed in the right internal jugular vein.

On September 29, 2003, entries made on the records maintained by Brentwood Gambro Health indicated that the dialysis the patient was receiving was inadequate as indicated by substandard kt/V measurements on dialysis. The latter is most likely due to inadequate vascular access. On September 30, 2003 the patient underwent a surgical procedure to repair a vascular graft.

On October 12, 2003, the patient was transported to Greater Southeast Hospital with the chief complaints of abdominal pain, fever, nausea, diarrhea, shortness of breath and chest discomfort. Gastroenteritis and congestive heart failure were diagnosed.

On November 8, 2003 the patient presented with a painful swollen arm that was determined to be caused by an infection in his vascular graft. He was hospitalized, treated with appropriate antibiotics and the graft removed – all of which are standard practice. He continued to receive three times weekly dialysis via a jugular catheter which had been placed by the surgeon. Inadequate clearance as measured by kt/V of 1.05, was identified in September, October, and November largely due to his vascular access problems. The patient's kt/V measurements ranged from 1.13 in September and October to 1.05 in November. The dialysis center wanted to maintain him at 1.52.

Over the prior year, there is documentation of multiple attempts to surgically create and maintain adequate vascular access. These attempts were plagued by inadequate flows and recurrent infections.

The record documents a number of measures and attempts by the dialysis team to improve the clearance rates of this patient, all of which are considered standard of care. These include the following:

1.  There were multiple attempts by the affiliated surgical staff in the previous year to create a properly functioning permanent vascular access in the form of an AV fistula or AV graft. The last attempt in late September 2003 had to be removed on November 8, 2003 due to severe infection at the graft site.

2.  The patient was dialyzed using the large surface area, high flux membrane artificial kidney (Gambro PSN 210) with each dialysis treatment.

3.  The blood flow rate, 300 ml/min and the dialysate flow rate, 800 ml/min were both at standard of care rates.

4.  The dialysis time was increased in October from 3.5 to 4 hours per session three times per week, which is also within the standard of care.

A second function of dialysis therapy is to help control fluid overload. The standard of care method is to obtain the patient's body weight before and after each dialysis treatment. Before each treatment, based on the pre-treatment body weight, the hemodialysis machine is adjusted to remove an amount of fluid equal to what the patient gained and to restore them to their "estimated dry weight". The estimated dry weight (EDW) is that body weight below which the patient is symptomatic from low blood pressure, and is often difficult to estimate, particularly in patients with heart failure. In patients with poor heart function, reduction in blood volume can result in precipitous falls in blood pressure.

During the treatments in the weeks preceding the patient's demise, it was documented by the dialysis staff that the patient denied shortness of breath and on physical exam had a clear chest and no peripheral edema. He also had reasonably well controlled blood pressure (130-160/80-90 mmHg) while gaining usually 2-4 kg (or 2.5 to 4.5 quarts) between dialysis treatments. However, he did have a history of volume overload in the months preceding his death.

This is not unusual in a dialysis patient with congestive heart failure, particularly when their intra-dialysis weight gain exceeds 2 kg. Excessive weight gain is also more frequent in selected younger patients who tend to be less responsible about their fluid intake.

Throughout his records there are recurrent recommendations about appropriate management of his fluid intake.

After the patient's last dialysis on December 26, 2003 his documented measured body weight was recorded as 70.1 kg (155 lbs). Yet, at the time of his postmortem examination several days later, his weight on the table was recorded as 183 lbs. This 28 lb weight difference between his last dialysis and the postmortem exam may represent a difference in the scales utilized, or may be an indication of massive fluid ingestion. Moreover, his post mortem exam indicated a dilated cardiomyopathy indicative of chronic heart failure. It is my opinion to a reasonable degree of medical certainty that his excessive weight gains between dialyses for a patient with heart failure, plus his excessive volume ingestion shortly before his demise largely contributed to his death.

His dialysis providers did their best to maintain his vascular access and his dialysis adequacy. He was taught by dieticians about appropriate diet and fluid ingestion, yet still gained weight to excess between dialysis treatments. Both his chemistries and blood pressures were adequate. It is my opinion that his dialytic care met the appropriate standard, and in no way contributed to his death.

Sincerely,

Matthew R. Weir, M.D.
Professor and Director
Division of Nephrology
University of Maryland School of Medicine


MRW/mw